Chief Judge Schroeder, may it please the Court, Michelle Rice and Sean O'Brien appearing for Henry Yuen and Elsie Mione, the appellants. Section 1103 is a powerful statute that for the first time authorizes the SEC to seize assets before the filing of a complaint. To obtain such a seizure, the SEC need only demonstrate that there is a lawful investigation and that extraordinary payments are about to be made. Section 1103 provides absolutely no guidance as to what makes a payment extraordinary and conversely what would make a payment ordinary and therefore exempt from its reach. In this case, the District Court granted the SEC's escrow application, despite an utter failure by the SEC, to show that the four categories of payments at issue could be considered extraordinary payments under even the broadest definition of that term. How does this terminology relate at all to what corporations normally do in assessing whether something is material and needs to be disclosed? The District Court cited 8K, which requires disclosures of material changes in the company's status, including resignation of directors. And the termination process in this case did involve the resignation of directors, at least they were directors of subs. And in fact, the company did itself assess that as material, apparently, and disclosed it. So what's so difficult about deciding whether something is extraordinary in this case when it involves the kind of structural changes, the termination agreements worked, and the large payouts that were involved? Well, if I understand your question, Your Honor, the standard by which something would be reported in an 8K is either a material event or an important event. We believe that's very different from the standard in this statute, an extraordinary payment. Oh, that's really — I didn't ask the question very well. But I'm trying to understand what's so different about a corporation having to make a judgment about what's material to its operations and not being able to decide what's extraordinary in its operations. Well, as I understand in 8K, what's reported is what is important to the shareholders, what must be disclosed to the shareholders. In operation here, Your Honor, what was disclosed to the shareholders were things like this restructuring. It is true. But also things like an appearance will be made in court next Friday. Okay. So the full panoply of corporate events were reported in the 8Ks, and the judge in this case, in the district court, did not consider whether GEMSTAR, for example, only reported extraordinary events in 8Ks or whether, indeed, it's corporate practice only to report corporate events. Well, but some of these are mandatory, and resignation or change in director is not discretionary under 8K disclosure. Isn't that correct? Well, it is true that a termination of the CEO and the CFO, indeed the founders of the company, would generally be reported in an 8K. Right. And payments not made in the usual and ordinary course of business, right? I'm sorry? And payments made in the usual and ordinary – payments that are not made in the usual and ordinary course of business that are material have to be disclosed on an 8K, too. Well, payments that are made, I would assume, yes, the payments that would not be made in the usual and ordinary course of its business. I do not agree, however, Your Honor, that the fact that a termination payment is being made to an executive that is terminated without cause would necessarily be an extraordinary payment. Would you agree that's a payment not made in the ordinary course of business? I would submit, Your Honor, that there was no evidence whether or not the payment that was made to the departing executives for terminations without cause was or was not made in the ordinary course of its business or in the ordinary course of business for corporate America generally. Well, one of the definitions of extraordinary in Black's Law Dictionary is something that occurs on a special occasion. That's not a regular payment that happens in the day-to-day operation of the business, but something that occurs in a special event, such as a resignation. Would that in itself not make it extraordinary? Well, the dictionary definition, Your Honor, both in Black's and in Webster's and basically any other dictionary you might consult will range from anything from merely unusual to unique or rare or special occasion. So I submit that a reference to a dictionary definition doesn't necessarily help you determine either what an extraordinary payment is. What does help you determine? Well, it's our view, Your Honor, that extraordinary payment is something other that is either a product of some sort of a securities violation and the payment therefore has some sort of nexus between the securities violation and the quantum of it. Why? I mean, you say extraordinary has a whole range of meanings, including something that just doesn't ordinarily regularly happen. Where do you go to find out which meaning to attach to extraordinary here? What is it that tells you? Well, the problem we have here is the statute certainly doesn't tell you. It offers no definitions. It offers no examples. But counsel, doesn't it also invest discretion in the commission? And part of that discretion would be to help define what is an extraordinary payment in the circumstances. Because the statute says whenever it shall appear to the commission that it's likely, et cetera. So isn't that discretion vesting a text? Well, we do not believe that it is. What I believe the discretion that's vested in the commission is to determine whether it's about to be made, not whether it is indeed an extraordinary payment. If it were otherwise. What do you do with the phrase, it shall appear to, whenever it shall appear to the commission? Well, Your Honor, if indeed that is correct, that it's the commission's discretion to determine whether it's an extraordinary payment, then there would be nothing in this statute that would have, that would be an objective term. There are only three elements of this in this statute. Whether there's a lawful investigation, and that is entirely within the discretion of the commission to either commence one or not to commence one. Whether a payment is about to be made, which again, it seems to be vested, the discretion seems to be vested in the commission. But whether the payment itself is extraordinary is something that we submit should not be vested in the discretion of the commission. So if there's a range of definitions, all of which are reasonable, you've already said in answer to Judge Reinhart's question that there's a whole range of reasonable definitions. Why shouldn't it be up to the commission to pick among the reasonable definitions and why don't we have to at least give some level of skid more or need deference to that selection? Well, if indeed it were up to the commission to determine what an extraordinary payment is, we submit they probably would have issued regulations saying precisely what it is. But notwithstanding, whether or not it's within the commission's discretion to ascertain what an extraordinary payment is, we submit there was no evidence presented to the district court which would give any reason for the judge to have concluded that it was an extraordinary payment. There's no evidence, for example. Well, what are we to make of the fact that Gemstar had separate agreements with your clients in terms of to put these in an escrow initially? I mean, wasn't there kind of a side agreement? Well, the way the entitlements originally came into being is there were 1998 agreements, employment agreements with my clients. As the restructuring process or the negotiations for the restructuring process began in November, they reached agreement on what the restructuring payments that would be made to my client. They were ultimately embodied in a restructuring agreement to which a day before the restructuring agreement was made. And that's when I told Gemstar to put the payments to my clients, payments that were made on November 7th of 2002, into a voluntary escrow for or segregated accounts for six months. Well, isn't that evidence that Gemstar thought that these might be extraordinary from the standpoint to give an opportunity for people to object to it or something along those lines or precisely those reasons? Gemstar, in those same documents, Your Honor, said that it had no claim to those funds and that, indeed, those funds could be released and that Gemstar, along with its lawyers and board, was going to meet with the SEC and with us for the purpose of specifically releasing those funds in that six-month period. So, no, Your Honor, I don't believe they were segregated for shareholders or anyone else to make a claim to them. And, indeed, the restructuring agreements themselves, the ones that were executed on November 7th, say these payments have been made. They were deemed to be made on November 7th. So they effectively became the property of my clients on November 7th and only to be dispersed on May 6th, six months later. Well, I guess, you know, allay my concerns of the fact that the backdrop of this particular statutory scheme was corporate looting and, you know, shareholders being left with nothing and all of that, and the top people taking all the money, leaving no retirement or anything for the little people that are left after. If we were to buy your approach in terms of how to define this, how would the policy reasons for the statutory scheme be accomplished? It seems that your approach allows the top people in a corporation that's going down just to take all the money and leave nothing for everyone else. Well, a couple things, Your Honor. To begin with, the statute itself makes no mention of its purpose, or it's incredibly scant and lacks detail. The legislative history seems to suggest that the purpose of this was to prevent pilfering of assets, to prevent the looting of assets. And with this, we would agree. And salutary purpose, though that may be, there was no evidence offered to the district court that that's what happened here. In fact, what was offered to the district court was just the opposite. What was offered to the district court was that there were five months of negotiation in which the SEC was a substantial and serious participant. So the SEC knows one month before the closing of this transaction exactly how much the payments are and when they're going to be made. GEMSTAR knows this. GEMSTAR's board of directors, 12 board of directors actively participated in the negotiations, as did GEMSTAR's 43 percent shareholder, the largest shareholder of the company, Rupert Murdoch. All of these forces get together for five months. They agree upon a payment to be made, knowing, by the way, that there was an audit committee investigation ongoing and then finally concluded prior to the restructuring, having appointed a special committee of the board of directors to look at these payments particularly to determine whether they were reasonable. And then even subsequent to the closing, the new CEO of GEMSTAR, Mr. Jeff Schell, sends a letter to CalPERS, an institutional investor, saying, we looked at these payments, we find these payments to be reasonable, and it wasn't just us that looked at it. Compensation consultants looked at it. The board looked at it. We had all of our advisors look at it, and we believe it to be reasonable. If you're right, why does one of your clients then take the Fifth Amendment when asked about this? Well, my client took the Fifth Amendment to all questions. It wasn't in relation to just this. My client took the Fifth Amendment because there was a criminal investigation. What is the importance, in your view, of the very limited effect of this determination that the payments are extraordinary? In other words, the only thing that really happens is that there's an escrow and an interest-bearing account for 45 days, and that can be extended. The consequence is rather small, and I wonder if that plays any role in deciding just how extraordinary extraordinary has to be when the consequence is not draconian. Well, it is true the statute provides for a 45- or 90-day freeze. This is true. The problem we have with that 45-days freeze is it's somewhat illusory. The only thing the commission has to do is to file an enforcement action, and because the commission's decision to file such an enforcement action is unreviewable, it frankly has a very, very, very low hurdle that it has to surmount in order to convert a 45-day or 90-day escrow into an indefinite one. The best proof of that, of course, is what has happened here. This escrow was obtained in May of 2002, and it's still in place, and it's December 2004. Let me ask you. It seems to me that your previous argument that the careful review and approval of these payments somehow blesses them from any kind of scrutiny, and I'm wondering whether that mixes up two propositions, one, which is the temporary freeze if there's an extraordinary payment, and the second proposition being whether or not down the road there may or may not be a disgorgement or whether the payments would actually be made because they may be reasonable, in fact, although extraordinary. So it seems to me under your argument that even if you had an extraordinary payment that was reasonable, that it could be paid out and basically the money be gone and the SEC would never have the chance to really continue its scrutiny, basically the cat's out of the bag. So I would appreciate if you could explain what your view is between these concepts of disgorgement, you know, temporary freeze, reasonable payments that may ultimately be paid out, and extraordinary payments which may be frozen temporarily. All right. I'll do my best, Your Honor. The mismatch between the statute itself and the legislative history is quite clear. The statute doesn't speak to its purposes or doesn't speak to what happens to the funds. The legislative history, in contrast, suggests that these payments should be at least While we look at it. To me, that suggests setting that once they obtain a freeze, they take the 45 or the 90 days, they look at the payment and they determine whether, in fact, it is the product of insiders making payments to insiders. So what's wrong with that? That's precisely what happens. That is, there is no evidence in the record, none, that there was either any collusion between GEMSTAR or That's the point. If you have something that's labeled extraordinary, all you want to do is put a freeze on it so you can investigate that. Well, you have to bring some evidence to the 1103 hearing suggesting that there was something improper about these payments. That's my point. Extraordinary doesn't mean yes. That was really my point. You're presuming impropriety. Extraordinary does not necessarily ultimately equate to impropriety. It might, but not necessarily. So isn't this just a mechanism, if you have a payment that's out of the ordinary, that basically can put it in the deep freeze until it's determined what is the legal status of that payment? Your Honor, the statute speaks of looting. The statute speaks of unwarranted payments. The statute speaks, or the legislative history anyway, the statute speaks of nothing. Right. But that's not the difference, though. I mean, we're construing the phrase extraordinary payments. You would like us to add some words to the statute that would say extraordinary and related to wrongdoing and so forth. The difficulty is it's not there. So then we have to decide what is extraordinary and what is not. And it would seem to me that the care that you've described, the months of negotiation, the special committees, also cuts the other way and might indicate that these were truly extraordinary payments, that is, not made in the normal course of business, that were material to the financial condition of the company. As Judge Byrne pointed out, though, the term extraordinary is a comparative modifier. So is material. So is material. You have to make a judgment as to whether something has some impact on the company. We're not talking about the ordinary public. That's what I'm trying to sort of fathom in your argument. Your argument proceeds as if this company isn't heavily regulated as a publicly traded company and has to make judgments all the time about what is material to the company, what is out of the ordinary course of business. And the whole conduct of the company, admirable perhaps, is that they took great care in this very large, on its face, a layperson would say, extraordinary amount of compensation package to determine whether it was reasonable. And you take that into the statutory context, which says if there's an investigation and it appears to the SEC that the company is about to make an extraordinary payment, it can freeze it for 45 days to find out whether anything justifies taking the next more onerous step. That's why I'm having trouble seeing what you're advocating that we should do to interfere with that process. What's so unclear and untoward about it in the context of the legislative history? Your Honor, whether you use the word extraordinary or you use the word material, in that they are comparative modifiers, both of them, you would expect that at the district court before one seizes $40 million, that there would be evidence offered as to what would be ordinary under the same circumstances. When was the last time the company ever made that kind of a payment to its chief executive or its CFO? There's nothing in the record that would answer that question, Your Honor, because nothing was offered by the SEC. We really should kind of start with basic principles here. You agree because it's a comparative term that it needs, that extraordinary needs to be benchmarked against something, correct? Exactly. And do you agree that it should be benchmarked against the company itself, the financial dealings and history of the company? It may be that a payment can be determined to be extraordinarily large in relation to the assets of the company. Okay. And so if you take those two propositions, then your argument boils down to whether or not this record supports a conclusion on those principles that there should be a freeze, correct? Well, I'm not sure if you could only state that because, for example, Gemstar had $1.2 billion in assets in 2001, that a payment is either extraordinary or non-extraordinary, a $40 million payment to two people to departing executives terminated without cause. Well, no, that really doesn't quite answer the question. If that's getting to the application of the facts to some legal principle, I'm just trying to get to the legal principle. If the relative comparison is to the company, which apparently you agree that is a reasonable interpretation of the statute, then what we need to do, in your view, is to really see whether the evidence supports a determination that these were extraordinary payments. Does it boil really down to a review of the evidence and the district court's judgment on that? Well, while I think that might be one way, certainly, of looking at it to determine whether the size of the payment is extraordinarily large relative to the assets of the company. I agree with that. I don't believe that that's the only way. Another way to look at it would be to determine whether it's extraordinarily large in relation to similarly situated companies making payments to departing executives terminated without cause. Well, why would you limit the inquiry to a situation which is by definition extraordinary, that is payments to departing executives without cause? That doesn't happen every day. Isn't by definition that an extraordinary event? I don't believe that it is. Does it happen every day? Well, it certainly doesn't happen every day, but it's neither a one-time event for any one corporation, and it occurs rather frequently and certainly rather frequently in the last many years. For any single company? Can you identify a single company where you would describe that as an ordinary common event? Well, the difficulty with the term is, is it an unusual event? Absolutely. Is it a one-time event? No. In this company, it wasn't a one-time event. If it's an unusual event, then what does unusual mean?  Very little. What guidance is there in unreasonable search and seizure? And the first question, unusual, again, it's a relative term only to what is usual as for unreasonable searches and seizures. You would look at a series of factors to determine its reasonableness. But we're back to the question of is a departure of an executive, an event that's a special occasion, an unusual event, something that doesn't occur with any regularity. If that's the meaning of extraordinary, it doesn't matter what the size of the payment is. I mean, it's certainly one you could easily see in the statute that they're talking about letting the business go on with its normal activities, its normal regular payments, but saying that the unusual payment, the extraordinary payment, the one that doesn't occur in the normal course, is one that should be held up until they can look at it more carefully. If that's what the statute means, then any severance payment would be subject to this kind of a freeze. And this is where I started with this question with you. How do we know that that's not the meaning of extraordinary that the statute contemplates? I don't know how we know what the statute contemplates because there's no definition contained in the statute. There's no examples provided in the statute. If you look strictly to a dictionary definition. Well, you, okay, but you have only a few minutes left. Could you just tell me procedurally how this is supposed to operate? Is the district court supposed to have a full-fledged trial with expert witnesses, with the financial officers from other corporations? How does this work? Well, certainly, I don't know that they're required to have an expert, but an expert would probably be best situated to determine what happens in both in the industry in which they are in and what similarly situated corporations would do. But a full-fledged trial seems to be it would be a couple of witnesses, evidentiary hearings at which the facts at issue were tested, something that did not happen here. Well, isn't the SEC itself considered sufficient as an expert? That's what their special responsibility is. It's given to them by Congress. And so when the SEC comes in, this isn't like Joe Jones wandering in off the street and saying this is extraordinary. This is the SEC. Doesn't that carry some special weight? It seems to me that if you permit the SEC to make all of the – there are only three factors in this statute. So if the SEC has the discretion to determine all of them, then there is virtually – there's certainly nothing for the court to do. We review things for abuse of discretion all the time. Take a look at the law books. I mean, that's standard fare for reviewing courts. That's bread-and-butter stuff. Plus, this money doesn't go out of the company in a way that disables the company. It's already gone from the company if you're giving it to departing people. So this doesn't hurt the company itself. The company's already made the decision to pour this out the back door. The difficulty with this statute and with what happened here is there's no evidence that this was a back door payment. Five and six times annual salary negotiated by a guy, Jonathan Orlik, who then is charged by the SEC with civil fraud arising out of this whole incident? I mean, the person who signed off on this thing, the general counsel then finds himself charged with civil fraud. Well, one, that's not in the record. And, two, Mr. Orlik was one of 12 directors, all of which have voted in favor of this. But to your first – He was the general counsel. But nevertheless, that's not in the records, Your Honor. But to the first point, to the first point, the five and six times doesn't appear magically in 2002. The five and six times, and frankly, that's not accurate, but the five and six times appears in 1998 in their employment agreements. This is not something that arises during the course of either the investigation or the course of the negotiation. They were simply carrying forward preexisting contractual obligations from agreements that were entered into four-plus years before an investigation. You have only about two minutes left. Well, are you – when you say that, are you referring to the accrued but unpaid vacation and accrued and unpaid salary? Is that what you're talking about? I'm talking about all four of them, all four components, Your Honor. The salary, the catch-up salary payments, the bonus payments, the vacation pay payments, and the severance payments were all predetermined in their 1998 agreements. Counsel, did the SBC, with its great expertise and discretion, offer any evidence as to other payment packages to other issuers, which indeed extended longer than five years or seven years? Did they offer anything of that sort? They offered nothing, Your Honor. Thank you. May I reserve the remaining time? Counsel, but those payments were linked to the revenue of the company, correct? In part. And the revenue of the – what the SEC was investigating was the fact that the revenue was inflated in the audited financial reports. Isn't that right? Yes. Yes. But they offered no evidence, Your Honor, of either of the transactions. And indeed, they said the opposite. They said we are under no obligation to offer any evidence concerning the securities fraud investigation. And indeed, if you look at the statute, Section 1103, the investigation is one piece of it, a lawful investigation is one piece of it, and the payments are a separate piece of it. So it – you can certainly understand why they believe that they wouldn't have to offer any evidence of a securities fraud violation to define extraordinary payments. Okay. Counsel, you now have 30 seconds left, but we'll leave you a minute on rebuttal. Chief Judge Schroeder, may it please the Court. Richard Humes on behalf of the Securities and Exchange Commission. In 2002, Congress enacted the Sarbanes-Oxley Act. Counsel, one of the definitions of extraordinary would cover all severance payments because that would be an extraordinary act regardless of the amount. As I read your brief, you're not taking the position that all severance payments could be automatically covered. Is that correct? Yes. Our view is that the test whether a particular payment is extraordinary has to be a case-by-case basis. So the mere fact that one particular severance package may be large doesn't mean that every severance package is going to be considered extraordinary. I think you happen to get the attending circumstances and the case. So you would not apply that particular definition of extraordinary. That's not what your view is of extraordinary as used in the Act. No. So this has to be extraordinary as a severance payment, an unusual type of severance payment. Well, I think that if you are looking at a particular issuer, you have to look at the circumstances under which the severance package is being made. And if you have circumstances like the ones that we saw at Gemstar with the company in danger of having its stock delisted by NASDAQ, it was restructuring. I'm sorry. It was restating more than $200 million in properly recognized revenue. It was amending its bylaws. When you have attending circumstances like that, it can make a severance package, which under ordinary circumstances would not be considered huge, extraordinary. Has the SEC issued an authoritative definition of extraordinary? No, we have not. Do you plan to? I don't think the Commission will do it. I think with a remedial statute like this, you want it to be interpreted flexibly. And if we were to give an overly prescriptive definition or interpretation where we perhaps said these 40 kinds of payments are extraordinary and these 40 are not, then once we did that, clever corporate lawyers are going to find a way to push all payments into the categories that are considered non-extraordinary. But they make an argument of vagueness. Aren't you sort of playing right into their hand? I mean, in terms of if you – I mean, you wouldn't have to say these type of payments or those type of payments, but you could list certain factors that need to be looked at like the district court did in this circumstance. Well, I think the factors that the district court identified are appropriate, including the fact it said that the approach must be done flexibly on a case-by-case basis. And so the three factors that the district court looked at in this case we believe are appropriate, but there could be others in other cases. Well, counsel, let's take a look at those three factors. And by flexible and case-by-case, I take it you're not saying that you're in favor of any particular Bright Line rule. Let's take a look at those factors. There was negotiation for five months. Why is that extraordinary under these circumstances? Because no issuer has as its ordinary business plan to terminate its management structure, its chairman of the board, CEO, CFO, during the course of a commission inquiry into improper revenue recognition at a time that they were at the helm of the company. Are you saying no other issuer? Are you comparing it to some other issuer? Well, if we look at another issuer that has done that, then — Did you compare it to any other issuer? I mean, you're saying that the negotiation of these restructuring payment agreements for five months with a team of consultants and tax attorneys and not tax attorneys and board of directors is extraordinary. I take it that you're saying, well, other people in similar circumstances haven't done this, and that's what's extraordinary about it. My question is, what are you comparing it to? Well, I think, in fact, when the matter was below, we did not do that comparison and for a good reason. Then why is it extraordinary? Why is it out of the usual? Don't you really have to first determine what is usual under the circumstances before you can determine what is unusual? Yes. And in this case, we submitted objective evidence of what the historical payments to the officers and directors involved were. Those objective benchmarks were available. But as to the fact that the district court found that the mere fact that five months of negotiation was used up in negotiating these termination payments made it unusual, made it extraordinary. What's extraordinary about that? Doesn't it depend, as you say, on a flexible case-by-case basis? Well, I think if you take the position that officers and directors are terminated from time to time and because they make a lot of money, there are huge severance packages that get negotiated and these get disclosed in an AK. Therefore, that happens in corporate America all the time, and it's not extraordinary routine. But the problem is that any particular issuer, it is extraordinary. Issuers don't have business plans to fire their management structure. So it's a violation. Well, any time you terminate a CEO without cause, and even if you give them a gold watch and a firm handshake, then that's extraordinary, isn't it, because the termination is unusual. But you have to look at the circumstances. Was that officer or director under investigation by the SEC? Now we're getting to it. What you're reading is a statute which says extraordinary circumstances, payments under extraordinary circumstances or payments under suspicious circumstances. Right? I'm saying that. That's how it should read. No. Applying the flexible test that the district court did, if you have suspicious circumstances like you had at GenStar, yes, they would be extraordinary. Well, so you're defining extraordinary payments not with the size of the payment, but with the circumstances under which they're made. Size is relevant. But if you take the — All right. Size is relevant to what? Size is relevant to whether it's extraordinary. How do you know whether size is relevant to whether it's extraordinary if, as Judge Matt Burns said, extraordinary is a relative adjective? What is it related to that is relevant? I think you relate it to the historical payments between the issuer and the officer-director. There's never been a payment before. Not even a gold watch to a janitor. Right? Now, what do you relate it to? We do, in fact, have payments. We do have the original payment. We have salary payments, but you've never had a termination payment before. There's never been a termination of an officer within the meaning of the Sarbanes-Oxley Act. Right? Of this company. Well, that in itself is going to make it extraordinary to the company. So any time that they terminate a CEO because he's decided he likes to play golf more than he likes to play with the company, that is an extraordinary event. But that's not the circumstance that we have here. But then you're saying that what makes it extraordinary are the circumstances. They're writing down the profits. They all must be enlisting, et cetera. Right? They are factors, yes. But those weren't mentioned by the district court. The district court mentioned three factors. Size, without a comparison to any other payments. The fact that there was five months of negotiation. And I can't remember the third one. Maybe you can help me on that. But none of those were delisting corporate write downs, whatever. I think that the factors that the district court did look to were adequate to demonstrate that the payments were extraordinary. But these other factors that I had mentioned today are in the record. The three factors were, one, the five months. Two, the payments were large. And three, the payments were listed on the 8K, as Fisher said, because they were material. Material is a different word from extraordinary, don't you think? Right. But didn't he proceed that with a discussion of what the situation was at Genstar, and the accounting wheels were coming off? Did you think also that one of the circumstances that you should apply in the flexible case-by-case approach is whether there was a claim to the Fifth Amendment? I think that is a factor, yes. Did the court think it was a factor also? Do you think that using the Fifth Amendment privilege not to incriminate oneself is a factor in determining whether the payment is extraordinary? In a civil context in which we were operating, yes, there's the adverse influence. As we look at these payments in this context, obviously, if we strictly say extraordinary, I think under the way you've construed the term, it could mean almost anything, because 8Ks, for example, 8K reporting can involve a whole lot of events. But I gather what you're saying under these circumstances, when you say under these circumstances, you're not just saying it's extraordinary payments alone. There has to be some investigation or some fraud component within the meaning of the Securities Act. Well, no, I'm not saying that. I'm saying that certainly if the payments are improper or illegal, if we knew that at the beginning of the investigation, which frequently we are not going to know, but if we knew that, those certainly would be covered. But there could be other payments that are facially legitimate, but because of the circumstances at the company, at the end of our investigation, if we file an action, we may want to try to recover those funds. So we want to maintain the status quo until we can do that. I understand the term circumstances case by case, but those don't give much guidance to a district court. So if we say, for example, that the payments have to be not in the normal course of business and material to the company, is that enough? I think there's a way of delineating. I think where when we identify extraordinary payments that we want to have a temporary freeze for, we're not going to go after the routine business payments that a company has to make in order to operate its business. I think those should continue to be made. You said that's not the test. It's not whether it's a routine business payment. You disavowed that test. You're talking about, as I understand it here. I mean, just because it's a severance payment, it's not routine. That's not enough. And you said, as I gather, even this amount of payment, if it had been done for somebody who'd done a magnificent job, you wouldn't have a problem with this payment. It's only because of the circumstances rather than the payment. Well, if appropriate, we could seek to freeze a payment to someone that was facially appropriate, because we may be looking at the company and believe that we are going to find financial irregularities and that that payment should be frozen while we continue our. What makes that an extraordinary payment, though? Once again, it depends on the circumstances. For example, you could have. Aren't you really saying then that it's a payment under extraordinary circumstances rather than an extraordinary payment, even though it's an ordinary payment, an appropriate payment? But if it's done at a time in the company's history that that's unusual. If I understand the question, you're saying, can you take an ordinary payment and go after it because the company is going through a crisis that's extraordinary? Yes, I believe so. If in looking at the just to test the hypothetical, if in this company they had had three episodes over their history where a failed CEO had been discharged and given a package of $30 million when he left, the first two were history were the baseline of prior operations. But this $30 million payment in the third case arose in circumstances where the company itself, the issuer. And let's let's even assume that the CEO somehow was totally innocent of any of this. Whatever was going on was a dissonant group within the company's management or board. So that the recipient whose monies are being frozen is not the target of the investigation. You're suggesting that the payment, which would not be extraordinary in the history of this company, would become extraordinary and freezable because of the potential misconduct of the issuer. The statute provides for that. And I think there's a good reason. And that is at the beginning of our investigation, we're not going to know all the people who might ultimately be implicated. And so when you have a large payment being made at a time where we, for example, are looking at improper revenue recognition, to have that money maintained for the short period of time that Congress gave us to conduct an investigation, I think is maintaining status quo in a way that Congress would have wanted. I take it, though, you can have a circumstance where you start your investigation, you don't know if there's a securities violation, but to preserve the status quo, you freeze the assets. You may well end up that there is no securities violation. Correct? That's right. And in fact, even though it might have appeared to be an extraordinary payment, it might well be a legitimate payment, albeit extraordinary. Correct? That's correct. So what the statute does is really give the SEC breathing room, if you will, so the money doesn't walk out the door. It gives us 90 days, and that's a lot of pressure. And do you – what is your position on whether one of the benchmarks could be other industry payments, as opposed to a benchmark against the company itself? That gives us a lot of concern for several reasons. One, we think looking at the historical payments at that particular issuer to that officer or director would be an objective benchmark. The information is probably going to be looked at in connection with the investigation in the first place, and so we don't have to conduct a second inquiry. The problem with the majority decision is that we would have to go out and find a similarly situated issuer making payments under similar circumstances. Well, no issuer is going to volunteer to us that they are making or have made payments that are comparable to another investigation that we're doing. Let me ask you this, though. You know, obviously you don't want to have to be required to do that, but are you saying that it isn't ever relevant what other companies are doing? Well, I think in the scheme, if you have a continuum of relevance, I think the best evidence would be that at the issuer, somewhere at the far end of the continuum would be. Well, but if you want it to be flexible, if you want it to be flexible, maybe that might be the best evidence, but I don't understand how you can say that that could never have any relevance. I didn't say that it could never have relevance. I said it would be at the far end of the continuum if I were choosing the evidence. Part of the problem is Congress gave us a very innovative tool, but it put pressure on us to deliver a case in 90 days. Congress must have contemplated that the proceedings on 1103 applications were going to be summary, made a minimal showing for us to establish, and it's only for 45 days. You had six months there, didn't you? First of all, you had 45 days. Then the defendants, or pardon me, the appellants in this case, gave you voluntarily, more or less voluntarily, a six-month waiting period. During that period of time, had you filed a complaint yet? We did at the end of the six months. You could have applied for a writ of attachment, but of course the objective evidence requirements of writ of attachment would be much more onerous than the SEC. But as to whether you had to find out what other companies were doing, are you saying that that is a burden upon the SEC? I have in my hand here a treatise called Golden Parachutes and Cushion Landings, which say everything you need to know about termination payments, probably a lot you don't need to know, about the S&P 500. This is available evidence, isn't it? But even if there are places where there is evidence about severance packages at other companies, that would just be the starting point because we would have to then show that they are similarly situated companies. Companies are so diversified today, what industry are we talking about? Then we'd also have to look for similarly situated officers and directors getting similar payments. So we have to conduct the second inquiry to meet that test. Is that what you hire expert witnesses to do? Well, but that assumes that we're going to have an evidentiary hearing with a trier of facts. An affidavit. An affidavit by an expert witness. But you would have to gather the evidence on which the expert could opine. So you have to conduct the investigation to do it. So there would be evidence of what other people in same or similar circumstances are doing at the time in the marketplace and compensating their departing executives. You are conducting a second investigation to get evidence for the first 1103 application. But that's what you have to do in any case where you're getting pretrial orders. That's my point.  It contemplated a hearing, however, right? It contemplated a petition to the court. We had to make a three-part show. An evidentiary hearing. It doesn't say evidentiary. It says we have to show. We have to show some evidence to the court. We have to show only that we have a legal investigation that involves possible violations of the securities laws and a likely payment. And this is extraordinary. How do you construe the intent of the language that some have picked up on where it says it shall appear to the commission? What's the thrust of that? I think it means that when the commission becomes aware that a payment might be made, it has to ‑‑ it may apply to a district court, but it's up to the district court to determine whether we have met our burden.  Thank you. How much of a nexus do you think there needs to be between the investigation and the payment in order to sustain a seizure under a freezer? Well, Congress didn't require any. I know. I'm asking you. And I think in most cases you are probably going to have a nexus. I think it's really going to be the exceptional case where there's no nexus. But I think we have to have that flexibility. So your position is there doesn't need to be any nexus at all between the investigation and the payment? Right. Because we're not going to know. I mean, it's quite a lever. It gives you enormous leverage over the CEOs of the company who are departing if you're saying you're going to ‑‑ unrelated to our investigation, we're going to seize payments. Well, that's why Congress, I think, put the 45-day deadline on it and gave us a total of 90 days to do the case. Wouldn't the more natural construction of the statute be that there has to be at least some nexus between the investigation and the payment? Otherwise, it would allow you to see assets that were completely unrelated to your investigation. The problem is we're not going to know at the beginning of an investigation which assets are really related to it or which payments are suspicious or not. And we might ultimately seek discouragement of it. So this is a measure that allows us to maintain the status quo while we sort things out through the investigation. I appreciate that. I guess what I'm suggesting, though, is that if you go into a situation where you know there is no nexus and you're simply seizing assets as leverage or because that you can or that you want to stop things, the company has to have some remedy for that because we're talking about the rights of people under legal agreements or determination clauses that have nothing to do with the SEC investigation. So it would seem to me that the more natural statutory construction to harmonize that would require at least some nexus between the investigation and the payment. And it might be just an affidavit saying we believe that there's a nexus. But there is a remedy in the statute because it allows a person affected by the freeze to petition the court to review it. So what ground? I think it's left to the good judgment of the district court. That doesn't give much evidence. What are the elements of that judgment? Well, if the applicant can show that for some reason it's not appropriate to continue the claim. What's appropriate? What you believe is appropriate? What the SEC believes is appropriate? That's a subjective value judgment, appropriate. Tell me, what objective lines can we draw here? It's a backstop for a case where there may have been a mistake. It allows the person affected to petition the court. How do you know there's a mistake made? That person shows that there was a mistake to the district court. By saying it's not extraordinary, other people are doing it and paying more. Is that enough? No, I don't think so. Because Congress permitted the courts to freeze assets even though we have not, at the beginning of the investigation, made a nexus between the fraud that we're looking at and that payment. Well, in that regard, it operates like an attachment statute with lower standards, does it not? In other words, you can go get an attachment and the property attached may be unrelated to your claim. It's just that you're basically preserving the corpus. So here you're preserving the corpus of the corporation, correct? That's what we're trying to do. And you're preserving the status quo until you can complete your investigation to determine whether or not, in fact, certain persons are looting the company. But it is highly unusual for public companies to be required to restate their public financial records, isn't it? Unfortunately, it's been fairly common recently. It used to be very unusual when I practiced corporate law. But, yeah, it is considered a negative in the public market. It's something the SEC does not view as a good situation for a company for whatever reason. And so could it be, in looking at the extraordinariness of this, that it was extraordinary for the very two people who are obligated, in fact, were ordered by the SEC to swear to the accuracy of the public financial records to be the ones who were getting these large buyouts? Yes. So to me, that seems like there's you found a link here. You found it early. And I don't know where it ended up. But you don't really know who all is responsible for all of the possible bad acts when you start out. That's the problem, exactly. Would you agree that, at a minimum, that the payment would have to satisfy the requirements of an 8K disclosure in order to be considered extraordinary? I don't know if I would go that far, but I think any payment that is disclosed in 8K as extraordinary. Can you think of a circumstance, though, that wouldn't require disclosure under 8K that would be deemed extraordinary? Because you're talking about the management of the 8K. You're talking about payments not in the ordinary course of business that are material to the company. If it's an immaterial payment, if it's in the ordinary course of business, if it's a payment to someone not in management, that certainly would not be an extraordinary payment, right? Well, the size of the payment may not be sufficiently large to trigger an 8K requirement. But it may be a payment that if we actually go after that person at the end of the day, we still may want to recoup. So it wouldn't be material financially in terms of the relationship to the assets. That's correct. Operating rhythm. Any further questions? Thank you. Good morning, Your Honors. Richard Stone representing Gemstar TV Guide International. I'm not here to argue per se, but I am here to answer any questions the Justices might have of me as a representative of the issuer. Thank you. Just one quick closing point. It cannot be, as the SEC suggests, that if a company is under investigation, the payment is automatically extraordinary. Otherwise, it would read out the extraordinary payment requirement in Section 1103 altogether. There is a separate requirement that the company be under investigation, and the very things that Mr. Hume spoke of may justify an investigation. But there is a separate requirement to show that a payment is extraordinary, and we submit there was no evidence in this record showing that the payments made to us in this case were extraordinary, either because they didn't compare it to same or similar companies under same or similar circumstances. Thank you. Thank you. The case just argued is submitted for decision, and the Court stands adjourned.
judges: Schroeder, Reinhardt, Trott, Thomas, Graber, McKeown, Wardlaw, Fisher, Clifton, Callahan, Bea